# United States Court of Appeals for the Federal Circuit

05-1400

CARIBBEAN ISPAT LIMITED
(now known as Mittal Steel Point Lisas Limited),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

GEORGETOWN STEEL COMPANY, LLC,
NORTH STAR STEEL TEXAS, INC.,
KEYSTONE CONSOLIDATED INDUSTRIES, INC.
and GERDAU AMERISTEEL CORP.,

Defendants-Appellees.

Mark A. Moran, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Matthew S. Yeo and Evangeline Keenan.

Jonathan J. Engler, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellee. With him on the brief were James M. Lyons, General Counsel and Andrea C. Casson, Assistant General Counsel For Litigation. Of counsel was Karen Veninga Driscoll.

Kathleen W. Cannon, Collier Shannon Scott PLLC, of Washington, DC, argued for defendants-appellees. With her on the brief were Paul C. Rosenthal and R. Alan Luberda.

Appealed from: United States Court of International Trade

Senior Judge Thomas J. Aquilino, Jr.

# United States Court of Appeals for the Federal Circuit

05-1400

CARIBBEAN ISPAT LIMITED
(now known as Mittal Steel Point Lisas Limited),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

and

GEORGETOWN STEEL COMPANY, LLC,
NORTH STAR STEEL TEXAS, INC.,
KEYSTONE CONSOLIDATED INDUSTRIES, INC.
and GERDAU AMERISTEEL CORP.,

Defendants-Appellees.

_____

DECIDED:  May 4, 2006

_____

Before BRYSON, LINN, and PROST, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

In August 2001 several domestic producers of steel wire rod filed petitions with the Department of Commerce and the International Trade Commission alleging that imports of steel wire rod from 12 countries, including Trinidad and Tobago, benefited from countervailing subsidies or were sold at less than fair value ("LTFV").  The

petitioners further alleged that the imports from those countries, both collectively and from each country separately, had caused material injury to the domestic wire rod industry. Certain preliminary and final determinations relating to the petition have been challenged in various proceedings in the Court of International Trade and in this court. The present appeal is limited to imports from Trinidad and Tobago. In October 2002, the Commission determined that LTFV imports, collectively and from Trinidad and Tobago alone, had caused material injury to the domestic industry. Caribbean Ispat Limited, a Trinidadian producer of steel wire rod, sought review of that determination in the Court of International Trade, but the court upheld the Commission's determination. Caribbean Ispat Ltd. v. United States, 366 F. Supp. 2d 1300 (Ct. Int'l Trade 2005). Caribbean Ispat appeals from that decision.

I

In an antidumping investigation such as the one in this case, the Commission is required to determine whether an industry in the United States is materially injured or threatened with material injury by reason of the imports that are the subject of the investigation. 19 U.S.C. § 1673d(b)(1). Section 1677(7) sets forth the factors and methods the Commission is to use in making a materiality determination. The statute requires the Commission, when making a materiality determination, to consider the volume of imports, the price effects of those imports, and the impact of those imports on the affected domestic industry. 19 U.S.C. § 1677(7)(B)(i). In addition to those factors, the Commission may consider "such other economic factors as are relevant to the determination." Id. § 1677(7)(B)(ii). The effect of non-subject imports (i.e., the flow of fairly traded goods into the United States) is often a relevant "other economic factor"

that the Commission looks at when considering whether a particular domestic injury was caused by the subject imports (i.e., as opposed to having been caused by the fairly traded goods alone).

Section 1677(7)(G)(i) sets forth the general rule that the Commission must cumulate imports from all countries that are subject to the investigation and that it must determine whether the impact of those cumulated imports is causing a material injury to the domestic industry. However, section 1677(7)(G)(ii) provides several exceptions to that general rule. One of those exceptions, mandated by the Caribbean Basin Economic Recovery Act (CBERA), 19 U.S.C. § 1677(7)(G)(ii)(III), exempts Caribbean nations from the cumulation rule and requires the Commission to analyze the volume, price effects, and impact of imports from Caribbean nations separately from those from all other countries. Because Trinidad and Tobago is the only Caribbean nation involved in the present investigation, CBERA required the Commission to assess Trinidad and Tobago's imports individually. Caribbean Ispat's appeal focuses on the application of CBERA to the Commission's investigation of imports of steel wire rod from Trinidad and Tobago.

II

The primary dispute in this case pertains to the causation analysis. The parties disagree as to whether and how LTFV imports from non-CBERA countries are assessed in determining whether the domestic industry was materially injured "by reason of" imports from Trinidad and Tobago. The Commission contends, and the Court of International Trade held, that the relevant statutes prohibit the Commission from considering the effect of LTFV imports from non-CBERA countries when weighing

the impact of imports from Trinidad and Tobago.[1]  Caribbean Ispat contends that

CBERA requires the Commission to weigh the impact of imports from Trinidad and

Tobago against the impact of all other imports (both LTFV and fairly traded imports),

and to determine whether imports from non-CBERA countries are "so significant" as to

render the impact of imports from Trinidad and Tobago immaterial.

A

In support of the argument that the statute prohibits the Commission from

considering the effect of LTFV imports from non-CBERA countries, the Commission

relies on the following passage from the Uruguay Round Agreements Act Statement of

Administrative Action (URAASAA):

> Existing U.S. law and legislative history fully implement the causation standard of the 1979 [Tokyo Round] Codes.  Thus, existing U.S. law fully implements [the causation provisions of the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 (Antidumping)].  [Those provisions] do include new language requiring WTO signatories to "examine all relevant evidence" including "any known factors, other than the dumped [or subsidized] imports which at the same time are injuring the domestic industry."  The obligations embodied in the new language are reflected in the existing statute and legislative history.

H.R. Doc. No. 103-316, vol. 1, at 851-52 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.

In the Commission's view, that passage limits the scope of the "other economic factors"

the Commission may consider, pursuant to 19 U.S.C. § 1677(7)(B)(ii), when making a

materiality determination.   Because the URAASAA notes that existing law allows

consideration of factors "other than the dumped imports," the Commission argues that

---

[1]     The domestic steel wire rod producers do not advance this argument. Rather, they argue that the Commission properly accounted for non-CBERA imports when it concluded that Trinidad and Tobago's imports caused material injury.

dumped imports from non-CBERA countries cannot be considered when determining whether a CBERA country caused material injury.

That argument reads too much into the URAASAA's brief discussion of causation. First, the passage does not speak to the unique circumstances of CBERA or other non-cumulation provisions. Second, we do not regard the above-quoted passage as Congress's comprehensive and exclusive interpretation of section 1677(7)(B)(ii). The passage does not specifically reference that statute, and the plain language of section 1677(7)(B)(ii) suggests a broad grant of discretion in materiality determinations that allows the Commission to "consider such other economic factors as are relevant." See also Angus Chem. Co. v. United States, 140 F.3d 1478, 1484 (Fed. Cir. 1998) (noting that the statute "permissively allows the Commission to consider other relevant factors as well, as the particulars of the case at hand may warrant"). In the present case, the Commission had authority to treat LTFV imports from non-CBERA countries as an "other economic factor," just as the Commission ordinarily treats fairly traded imports as an "other economic factor" in dumping investigations that do not involve CBERA countries. See, e.g., Gerald Metals, Inc. v. United States, 132 F.3d 716, 723 (Fed. Cir. 1997) (remanding because the "Court of International Trade failed to consider properly the presence of fairly-traded Russian imports in affirming the Commission's determination of material injury by reason of the LTFV goods").

In addition to the argument based on the URAASAA, the Commission contends that permitting consideration of the effect of LTFV imports from non-CBERA countries would render the statute internally inconsistent. That is because CBERA allows the Commission to aggregate dumped imports from CBERA and non-CBERA countries

when assessing whether the imports from non-CBERA countries are causing a material injury to a domestic industry. Thus, the Commission argues, it would be illogical to compare the impact of imports from Trinidad and Tobago to the cumulated impact of all subject imports, because the cumulated impact includes the impact of imports from Trinidad and Tobago.

The purported inconsistency is avoided by recognizing that the CBERA exception requires a separate and independent analysis of imports from CBERA countries to determine whether those imports are causing a material injury. That separate analysis is required regardless of whether non-CBERA countries are also analyzed in the same investigation. The fact that CBERA imports are factored into the analysis of cumulated imports has no bearing on the separate analysis the Commission is required to undertake to assess the impact of CBERA imports.

The Commission also argues that, pursuant to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), we must defer to the Commission's reasonable interpretation of the statute. The problem with that argument is that the interpretation advanced in the Commission's brief in this case does not represent the Commission's considered, consistent, or formal interpretation of section 1677(7)(B)(ii). To the contrary, in a similar case the Commission has considered the effect of other LTFV imports when determining whether particular imports from a country subject to a similar non-cumulation provision caused a material injury to a domestic industry. See Pure Magnesium from China and Israel, USITC Pub. 3467, Inv. Nos. 701-TA-403, 731-TA-895-896, at 23 (Nov. 2001) (comparing the volume of dumped imports from Israel to the volume of dumped imports from China). Similarly, in

this case the Commission did not assert that it was barred from considering the effect of dumped goods from non-CBERA countries. Instead, that view was raised, for the first time, in the Commission's brief to the Court of International Trade.

Although <u>Chevron</u> deference is not strictly limited to agency decisions that are the result of formal rulemaking or adjudication, an interpretation that is advanced by counsel in the course of litigation—not accompanied by any indication that it is the considered policy of the agency—is not the sort of interpretation that Congress intended to carry the "force of law." <u>United States v. Mead Corp.</u>, 533 U.S. 218, 226-27 (2001); <u>see also</u> <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 212-13 (1988) ("We have never applied [<u>Chevron</u> deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice. . . . Congress has delegated to the administrative official and not to appellate counsel . . . ." (internal quotation marks omitted)). Thus, <u>Chevron</u> deference has no place in this case.

Nor do we see any reason to accord deference under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944), to the interpretation advanced in the Commission's brief in this litigation. The degree of deference to an agency's interpretations of a statute in the course of administering its statutory responsibilities "has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertise, and to the persuasiveness of the agency's position." <u>Mead Corp.</u> 533 U.S. at 228; <u>see also</u> <u>Cathedral Candle Co. v. Int'l Trade Comm'n</u>, 400 F.3d 1352, 1366 (Fed. Cir. 2005) ("[W]e believe the Supreme Court intends for us to defer to an agency interpretation of the statute that it administers if the agency has conducted a careful analysis of the statutory issue, if the agency's position

has been consistent and reflects agency-wide policy, and if the agency's position constitutes a reasonable conclusion as to the proper construction of the statute, even if we might not have adopted that construction without the benefit of the agency's analysis."). The argument proffered in the brief has none of those characteristics. In fact, the Commission's analysis in Pure Magnesium from China and Israel suggests that the Commission has recently endorsed an approach that is at odds with the argument advanced in the brief. Moreover, as discussed above, we believe that the reasoning in support of that argument is unpersuasive. Accordingly, we see no reason to defer to the position taken in the brief under the Skidmore doctrine.

Thus, the Court of International Trade erred by concluding that the Commission was prohibited from considering the effects of LTFV imports from non-CBERA countries when it assessed imports from Trinidad and Tobago.

B

Caribbean Ispat contends that "the Commission committed legal error because it did not evaluate whether the effects of [Trinidad and Tobago's] imports were material in light of the vastly larger volumes of other subject imports." Additionally, Caribbean Ispat contends that the Commission's analysis "said literally nothing at all" about the effect of fairly traded imports. Caribbean Ispat asserts that if the Commission had properly considered LTFV and fairly traded imports from non-CBERA countries, the Commission would have had to conclude that the effects of those other imports were "so significant" and their presence so "dominant" as to render Trinidad and Tobago's LTFV imports immaterial. The domestic steel rod producers argue that the Commission considered the effect of LTFV and fairly traded imports when it concluded that Trinidad and

Tobago's imports were, themselves, having a significant adverse impact on the domestic industry. In light of this court's recent decision in <u>Bratsk Aluminum Smelter v. United States</u>, No. 05-1213 (Fed. Cir. Apr. 10, 2006), however, we cannot uphold the Commission's decision.

In <u>Bratsk</u>, we addressed the "by reason of" standard, and explained that

[w]here commodity products are at issue and fairly traded, price competitive, non-subject imports are in the market, the Commission must explain why the elimination of subject imports would benefit the domestic industry instead of resulting in the non-subject imports' replacement of the subject imports' market share without any beneficial impact on domestic producers.

<u>Id.</u>, slip op. at 7.

In the present case, the Commission found a "high level of fungibility between subject imports from Trinidad and Tobago and the domestic product, and between subject imports from Trinidad and Tobago and imports from each of the other subject countries." However, the Commission did not specifically address whether Trinidad and Tobago's imports could or would be replaced by other imports so that the domestic industry would not benefit from the removal of Trinidad and Tobago's imports from the U.S. market. Because CBERA required the Commission to treat Trinidad and Tobago's imports separately from all other imports, our holding in <u>Bratsk</u> indicates that, in the present case, the "Commission is required to make a specific causation determination and in that connection to directly address whether [other LTFV imports and/or fairly traded imports] would have replaced [Trinidad and Tobago's] imports without any beneficial effect on domestic producers." <u>Id.</u>, slip op. at 9. The Commission did not make that specific determination in this case. We therefore remand for further

05-1400                                    9

consideration of the causation analysis in light of <u>Bratsk</u> and our discussion of CBERA

in this opinion.

<u>VACATED AND REMANDED</u>.