# United States Court of Appeals for the Federal Circuit

2007-1552

MITTAL STEEL POINT LISAS LIMITED
(formerly known as Caribbean Ispat Limited),

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellee,

v.

GERDAU AMERISTEEL CORP.
and KEYSTONE CONSOLIDATED INDUSTRIES, INC.,

Defendants-Appellants.

Mark A. Moran, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief was Alexandra E.P. Baj. Of counsel were Jamie B. Beaber and Susan R. Gihring.

James M. Lyons, General Counsel, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellee. With him on the brief were Andrea C. Casson, Assistant General Counsel for Litigation, and Marc A. Bernstein, Attorney.

Kathleen W. Cannon, Kelley Drye & Warren LLP, of Washington, DC, argued for defendants-appellants. With her on the brief were Paul C. Rosenthal and R. Alan Luberda.

Appealed from: United States Court of International Trade

Senior Judge Thomas J. Aquilino, Jr.

# United States Court of Appeals for the Federal Circuit

2007-1552

MITTAL STEEL POINT LISAS LIMITED
(formerly known as Caribbean Ispat Limited),

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellee,

v.

GERDAU AMERISTEEL CORP.
and KEYSTONE CONSOLIDATED INDUSTRIES, INC.,

Defendants-Appellants.

Appeal from the United States Court of International Trade in case no.
02-00756, Senior Judge Thomas J. Aquilino, Jr.

_____

DECIDED:  September 18, 2008
_____

Before BRYSON and PROST, <u>Circuit Judges</u>, and  ZAGEL, <u>District Judge</u>.<sup>*</sup>

BRYSON, <u>Circuit Judge</u>.

Gerdau Ameristeel Corp. and Keystone Consolidated Industries, Inc., (jointly,

"Gerdau") appeal from the judgment of the Court of International Trade upholding a final

_____

<sup>*</sup>    Honorable James B. Zagel, District Judge, United States District Court for
the Northern District of Illinois, sitting by designation.

determination by the International Trade Commission. The issue on appeal is whether, on remand from a prior appeal to this court, the Commission was compelled by our remand instructions and prior decisions of this court to conclude that less than fair value ("LTFV") imports of steel wire rod from Trinidad and Tobago did not cause a material injury to a domestic industry. We hold that the Commission was not compelled to reach that conclusion. We therefore vacate the judgment of the Court of International Trade and remand the case to that court with instructions to remand the case to the Commission.

I

This appeal arises out of an antidumping investigation that began in August 2001 when several domestic producers of steel wire rod filed antidumping petitions with the Commission. In their petitions, the domestic producers alleged that LTFV imports of steel wire rod from 12 countries, including the Republic of Trinidad and Tobago, had caused material injury to the domestic industry. In its first final determination, the Commission concluded that LTFV imports from the 12 countries had caused material injury to the domestic industry. The Commission further determined that the evidence supported a finding that LTFV imports from Trinidad and Tobago alone had caused material injury to the domestic industry.

Mittal Steel Point Lisas Ltd., formerly known as Caribbean Ispat Ltd., appealed the Commission's final determination to the Court of International Trade. In that appeal, Mittal challenged the Commission's interpretation of a provision of the Caribbean Basin Economic Recovery Act ("CBERA"), 19 U.S.C. § 1677(7)(G)(ii)(III). The Court of International Trade upheld the Commission's final determination, agreeing with the

Commission that CBERA prohibits the Commission from considering the effects of LTFV imports from non-CBERA countries when assessing whether subject imports from Trinidad and Tobago caused material injury to the domestic industry. Caribbean Ispat Ltd. v. United States, 366 F. Supp. 2d 1300 (Ct. Int'l Trade 2005).

On appeal, we held that "the Court of International Trade erred by concluding that the Commission was prohibited from considering the effects of LTFV imports from non-CBERA countries when it assessed imports from Trinidad and Tobago." Caribbean Ispat Ltd. v. United States, 450 F.3d 1336, 1341 (Fed. Cir. 2006). We therefore remanded the case for further proceedings in light of that holding. In addition, we directed the Commission to take into account our then-recent decision in Bratsk Aluminum Smelter v. United States, 444 F.3d 1369 (Fed. Cir. 2006). In Bratsk, this court held that "whenever the antidumping investigation is centered on a commodity product, and price competitive non-subject imports are a significant factor in the market," the Commission is required "to explain why—notwithstanding the presence and significance of the non-subject imports—it concluded that the subject imports caused material injury to the domestic industry." Id. at 1375.

Based on the decision in Bratsk, we instructed the Commission "to make a specific causation determination and in that connection to directly address whether [other LTFV imports and/or fairly traded imports] would have replaced [Trinidad and Tobago's] imports without any beneficial effect on domestic producers." Caribbean Ispat, 450 F.3d at 1341 (quoting Bratsk, 444 F.3d at 1375).

On remand, the Commission first considered the statutorily mandated present material injury factors specified in 19 U.S.C. § 1677(7)(B)(i):

2007-1552                                    3

(I) the volume of imports of the subject merchandise,

(II) the effect of imports of that merchandise on prices in the United States for domestic like products, and

(III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States . . . .

The Commission found that each of those factors favored a finding of material injury by reason of subject imports from Trinidad and Tobago. In its analysis of the price effects and the impact of Trinidadian imports, the Commission found that the injury to the domestic industry could not be entirely explained by the market presence of non-subject imports and non-Trinidadian subject imports. The Commission therefore concluded that subject imports from Trinidad and Tobago had caused material injury to the domestic industry "based on the significant and increasing volume and market share of subject imports from Trinidad and Tobago in a shrinking market, significant price underselling and significant price suppression by these imports, and declining industry indicators from 1999 to 2001."

With respect to the question whether the domestic industry was threatened with material injury in the foreseeable future, the Commission found that Mittal had the ability to increase its exports to the U.S.; that the subject imports from Trinidad and Tobago had undersold the prices for the domestic like product and were likely to continue to have a significant suppressing effect on domestic prices; and that the subject imports were likely to have a negative effect on the domestic industry's production and development efforts. For those reasons, the Commission found "a likelihood of continued imminent injury to the domestic industry from subject imports from Trinidad and Tobago." The Commission therefore concluded that "application of the statutorily-

mandated threat factors, as well as of the statutorily-mandated present material injury factors each would have led us to an affirmative determination."

Despite reaching that conclusion, the Commission stated that it could not issue an affirmative determination of material injury by reason of the subject imports because of this court's remand instructions relating to the requirements of Bratsk. First, the Commission stated that our remand instructions seemed to require the Commission to treat all steel wire imports as fungible commodity products. Next, the Commission determined that the record supported a finding that non-Trinidadian imports were present in significant quantities and were a significant factor in the U.S. market. The Commission then turned to the question whether non-Trinidadian imports would have replaced Trinidadian imports and, if so, whether the absence of imports from Trinidad and Tobago would have had any beneficial effect on domestic producers during the period of investigation.

In addressing that issue, the Commission first concluded that the record supported a determination that producers in countries other than Trinidad and Tobago had sufficient capacity that they "could have, if so inclined, exported sufficient volumes to the U.S. during the [period of investigation] to fully replace subject imports from Trinidad and Tobago." While the Commission found that non-Trinidadian imports had the capacity to replace imports from Trinidad and Tobago, however, it stated that it was unable to conclude that those non-Trinidadian imports would have replaced subject Trinidanian imports. The Commission explained that it was unable to make that finding because of the lack of evidence in the record on that issue. Nonetheless, the Commission invoked a presumption that the subject imports would have been replaced.

It applied that presumption based on its perception that this court had required the Commission to make a negative determination unless evidence in the record supported the conclusion that "non-subject imports would not have replaced subject imports or if they would have replaced them, would not have resulted in a benefit to the domestic industry." The Commission added that this court "appears to have created a presumption under the Bratsk replacement/benefit test that if a foreign producer could 'replace' subject imports, it would."

The Commission next turned to the question whether there would have been any benefit to the domestic industry if subject imports had been absent from the market. The Commission found that the "low prices or average unit values at which many [non-Trinidadian] imports entered the United States" weighed against a finding that the removal of the Trinidadian imports would have resulted in a benefit to the domestic industry. The Commission therefore determined that the domestic industry was not materially injured by reason of the subject imports. In so doing, however, the Commission made clear that it was reaching that conclusion only because it believed it was compelled to by the analysis required under Bratsk. The Commission stated that "we believe the Federal Circuit's decision in Bratsk and its remand order in this case compel us to reach a negative determination in this investigation, even though we believe an affirmative determination is consistent with the statute and supported by the factual record." Finally, the Commission noted that its conclusion with respect to the causation analysis applied equally to its analysis of whether there was a threat of material injury by reason of subject imports from Trinidad and Tobago.

Commissioners Koplan and Lane dissented from the Commission's analysis of Bratsk. In their view, the Commission majority had erred in considering the steel wire rod under investigation to be a commodity product. For that reason, they stated that they would have issued an affirmative determination.

On appeal from the Commission's negative determination, the Court of International Trade affirmed. The court ruled that the Commission had conducted the remand proceedings as this court directed and that the court could not agree with the appellants "that the agency record, such as it still is, does not support [the Commission's] specific causation determination." Mittal Steel Point Lisas Ltd. v. United States, 495 F. Supp. 2d 1374, 1380 (Ct. Int'l Trade 2007).

## II

Gerdau challenges the Commission's negative determination on a number of grounds. First, Gerdau argues that the "replacement/benefit test" applied by the Commission, based on its understanding of this court's decision in Bratsk, lacks statutory support and therefore is not in accordance with law. Second, Gerdau challenges the Commission's conclusion that this court made a factual finding with respect to the interchangeability of the steel wire imports at issue in the investigation. Third, Gerdau argues that the Commission erred in applying a rebuttable presumption that imports from Trinidad and Tobago would have been replaced by imports from countries having the capacity to replace the Trinidadian imports. Finally, Gerdau argues that the Commission misapplied the "replacement/benefit test" in connection with its threat determination.

The Commission responds that, although it regards this court's remand instructions as reflecting an incorrect interpretation of the antidumping statute, its negative determination should be upheld because it faithfully applied the remand instructions in this case and the more general directions provided by this court's decision in Bratsk. Mittal supports the Commission's negative determination, arguing that the Commission correctly applied the principles of Bratsk and that those principles are not in conflict with the antidumping statute.

The Commission begins its argument by setting forth its contention that, apart from requiring that the Commission consider the three factors specified in section 1677(7)(B)(i), the antidumping statute does not require the Commission to perform any further analysis when determining whether a material injury was "by reason of" subject imports. In addition to those three "mandatory" factors—the volume of subject imports, the effect of those imports on prices in the United States, and the impact of those imports on domestic producers—section 1677(7)(B)(ii) provides that the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." Because the language of section 1677(7)(B)(ii) is permissive, the Commission argues that it has discretion to go beyond the three factors set forth in section 1677(7)(B)(i), but it is not required to do so.

While the Commission is correct that section 1677(7)(B)(ii) affords it discretion to consider factors other than the three factors set forth in section 1677(7)(B)(i), that discretion is not unbounded, but is subject to general principles of administrative law. In particular, the Commission would abuse its discretion if, by ignoring a relevant

economic factor that it could consider under section 1677(7)(B)(ii), the Commission "entirely failed to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355-56 (Fed. Cir. 2005) (applying that principle to an antidumping determination and citing other cases applying the same principle in the same context). In making its determination as to whether the harm to the domestic injury occurred "by reason of" the LTFV imports, the Commission was required to "examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; see also 19 U.S.C. § 1677(7)(B) ("In the notification required under section 1671d(d) or 1673d(d) of this title, as the case may be, the Commission shall explain its analysis of each factor considered under clause (i), and identify each factor considered under clause (ii) and explain in full its relevance to the determination.").

While the Commission may not enter an affirmative determination unless it finds that a domestic industry is materially injured "by reason of" subject imports, the Commission is not required to follow a single methodology for making that determination. In United States Steel Group v. United States, 96 F.3d 1352 (Fed. Cir. 1996), this court emphasized the Commission's broad discretion with respect to its choice of methodology. The court stated:

> This court has no independent authority to tell the Commission how to do its job. We can only direct the Commission to follow the dictates of its statutory mandate. So long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable.

Id. at 1362; see also S. Rep. No. 96-249, at 75 (1979), as reprinted in 1979 U.S.C.C.A.N. 381, 461 ("The determination of the ITC with respect to causation is,

under current law, and will be, under [19 U.S.C. § 1673d], complex and difficult, and is a matter for the judgment of the ITC.").

In reviewing an affirmative injury determination for substantial evidence, this court requires evidence in the record "to show that the harm occurred 'by reason of' the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods." Gerald Metals, Inc. v. United States, 132 F.3d 716, 722 (Fed. Cir. 1997). In analyzing the issue of causation, the Commission has broad authority to consider "any relevant factors." Allegheny Ludlum Corp. v. United States, 287 F.3d 1365, 1376 (Fed. Cir. 2002). Our review of the Commission's causation analysis in antidumping cases is therefore limited to whether the Commission complied with certain minimum requirements imposed by statutory provisions and principles of administrative law.

We applied the principles described above in our decisions in Gerald Metals and Bratsk. In Gerald Metals, we reviewed an affirmative determination by the Commission, subsequently sustained by the Court of International Trade, that Russian, Ukrainian, and Chinese magnesium imports caused material injury to the domestic industry. 132 F.3d at 716. Gerald Metals appealed that determination with respect to LTFV Ukrainian imports. On appeal, this court observed that the record supported an inference that fairly traded Russian imports were substitutes for the subject Ukrainian LTFV imports. Id. at 720-21. We concluded that the Commission "fail[ed] to incorporate the undisputed facts about fairly-traded imports into its analysis of the harm caused by reason of the cumulated LTFV imports." Id. at 720. In its review, the Court of International Trade had found no evidence in the record to support Gerald Metals' argument that "fairly-traded

Russian imports would have replaced all or the greater part of the subject imports." Id. at 721. After reviewing the record, however, we held that we could not affirm the decision of the Court of International Trade without further explanation of whether fairly traded Russian imports would have replaced the subject imports. Id. Because the record on appeal did not support the conclusion that LTFV imports "were the reason for the harmful effects to the domestic magnesium industry," we remanded the case to the Court of International Trade. Id. at 722-23. Noting that the statute "requires adequate evidence to show that the harm [to the domestic industry] occurred 'by reason of' the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods," we held that the failure of the Court of International Trade "to consider properly the presence of fairly-traded Russian imports" rendered the court's decision erroneous. Id.

In Bratsk, we held that the Commission had failed to consider an important aspect of the causation analysis under Gerald Metals when it did not address whether non-subject imports would have replaced the subject imports at issue—silicon metal imports from Russia. 444 F.3d at 1375. We acknowledged in Bratsk that "there may [have been] support for the Commission's ultimate determination in the record," but we found that the Commission did not provide a satisfactory explanation for its affirmative determination. Id. Instead of considering whether non-subject imports would have replaced the subject imports, the Commission had limited Gerald Metals to its "unique facts." Id. We therefore remanded the case for the Commission to include in its causation analysis a determination as to whether non-subject imports would have replaced subject imports without any benefit to the domestic industry. Id. at 1376.

In this case, as in Bratsk, the Commission's first final determination "did not specifically address whether Trinidad and Tobago's imports could or would be replaced by other imports so that the domestic industry would not benefit from the removal of Trinidad and Tobago's imports from the U.S. market." Caribbean Ispat, 450 F.3d at 1341. On remand, the Commission analyzed whether other imports would have replaced subject imports from Trinidad and Tobago. At the conclusion of that analysis, the Commission issued a negative determination as to whether the domestic industry had been injured by reason of the subject imports but, as noted, the Commission made clear that it reached that conclusion only because it felt compelled to do so by the terms of this court's remand instructions and the analytical approach required by Bratsk.

We think the Commission interpreted this court's remand instructions and the decision in Bratsk too rigidly, in three respects. First, the Commission viewed our remand instructions as foreclosing it from making a finding as to one of the "triggering factors" for applying the Bratsk analysis—the question as to whether the merchandise subject to investigation was a commodity product. Second, the Commission interpreted the Bratsk analysis as looking to whether an antidumping order would result in a benefit to the domestic industry by eliminating the subject imports from the market in the future, rather than looking to whether the hypothetical removal of the LTFV subject imports would have resulted in their replacement by non-subject or non-LTFV imports with no resulting benefit to the domestic industry. Third, the Commission interpreted Bratsk as adopting a rebuttable presumption that subject imports would be replaced by non-subject imports and, absent an affirmative showing to the contrary, requiring the Commission to make a negative determination. We now address each of these issues.

A

In the remand proceedings, the Commission found that the products at issue comprise "a continuum of at least 11 major categories of products, ranging from low carbon wire rod such as industrial wire rod used for nails and coat hangers, to medium to high carbon wire rod."  Notwithstanding that finding, the Commission concluded that our decision in the prior appeal in this case had already resolved the issue of fungibility and foreclosed the Commission from making a contrary finding that the products were not fungible.  The Commission stated that our opinion "appear[ed] to assume that wire rod is a 'commodity' product as defined in Bratsk, since it stated that the task remaining before the Commission is to conduct the replacement/benefit test, not to analyze whether the threshold factors in Bratsk have been met."

Our prior decision did not purport to make a factual finding that all steel wire rod imports at issue in the Commission's investigation were fungible and therefore should be treated as commodity products for purposes of the Bratsk analysis.  Rather, we simply observed that "the Commission found a 'high level of fungibility between subject imports from Trinidad and Tobago and the domestic product, and between subject imports from Trinidad and Tobago and imports from each of the other subject countries.'"  Caribbean Ispat Ltd., 450 F.3d at 1341 (quoting the final determination of the Commission).  While we may have assumed, based on the quoted language from the Commission's earlier determination, that the Commission's finding with respect to the commodity nature of the products would likely be the same as its finding with respect to cumulation, the Commission has explained in some detail why the two are not necessarily the same.  If we were wrong in our assumption as to what the

Commission's finding would be with respect to the commodity issue, it was the Commission's prerogative to say so.

The Commission, and not this court, is the finder of facts in antidumping investigations, and it is up to the Commission to make findings of fact on issues such as fungibility. Appellate courts do not make factual findings; they review them. See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986) (appellate court may set aside findings of fact it determines to be clearly erroneous and may reverse incorrect judgments of law based on proper factual findings, but "it should not simply [make] factual findings on its own"); Middleton v. Dep't of Def., 185 F.3d 1374, 1383 (Fed. Cir. 1999) ("as an appellate court, we may not find facts"); First Interstate Bank of Billings v. United States, 61 F.3d 876, 882 (Fed. Cir. 1995) ("It would be a distortion of our role to draw conclusions about the facts . . . rather than having the trial court make its own findings in light of the [legal] standard that we have endorsed.") (citing Icicle Seafoods, supra). For purposes of further proceedings in this case, the Commission should regard the issue of fungibility as an open factual issue for it to resolve.

B

In its final determination, the Commission interpreted Bratsk to require it "to determine whether non-subject imports would fill the void created by the 'elimination' of subject imports despite the fact that there may be no such void created by an order." The Commission criticized that requirement on the ground that it "misconstrues the purpose of the statute, which is not to bar subject imports from the U.S. market, but is meant instead to 'level[] competitive conditions' by imposing a duty on subject imports and thus enabling the industry to compete against fairly traded imports." The

Commission added that the Bratsk analysis is contrary to the principle that "under the statute, it is not required, nor is it permitted, to reach a negative determination based on the likely effectiveness of an order. . . .  The statute contemplates that not all orders will be effective and does not ask the ITC to perform an additional inquiry to predict the future effectiveness of import relief."

In its brief on this appeal, the Commission echoes the same concerns.  It argues that the antidumping statute "does not state that imposition of antidumping or countervailing duty is appropriate only if the Commission establishes in its injury determination that such relief will be effective."  The Commission adds that the statute "recognizes that not all orders will be effective and does not provide for the Commission to perform an additional inquiry to predict the future effectiveness of import relief."

Those objections are based on what appears to be a misapprehension of the purpose of the analysis discussed in Bratsk.  The comments reveal that the Commission views Bratsk as holding that an antidumping duty order may be entered only if the Commission can determine that the order would be "effective" in the future by causing the elimination of the subject imports from the market, which imports would not then be replaced by non-subject imports.

That characterization misses the point of Bratsk.  The decision in Bratsk was not addressed to the potential effectiveness of any possible remedial order.  Instead, it was directed to determining the cause of the injury already suffered by the domestic industry.

An important element of the causation inquiry—not necessarily dispositive, but important—is whether the subject imports are the "but for" cause of the injury to the domestic industry. As the Supreme Court has explained,

> But for causation is a hypothetical construct. In determining whether a particular factor was a but-for cause of a given event, we begin by assuming that that factor was present at the time of the event, and then ask whether even if that factor had been absent, the event nevertheless would have transpired in the same way.

Price Waterhouse v. Hopkins, 490 U.S. 228, 240 (1989).

In this context, that principle requires the finder of fact to ask whether conditions would have been different for the domestic industry in the absence of dumping. Thus, Bratsk (like Gerald Metals) directs that in cases involving commodity products in which non-LTFV imported goods are present in the market, the Commission must give consideration to the issue of "but for" causation by considering whether the domestic industry would have been better off if the dumped goods had been absent from the market. That inquiry is not concerned with whether an antidumping order would actually lead to the elimination of those goods from the market in the future or whether those goods would be replaced by goods from other sources. Rather, the inquiry is a hypothetical one that sheds light on whether the injury to the domestic industry can reasonably be attributed to the subject imports. The focus of the inquiry is on the cause of injury in the past, not the prospect of effectiveness in the future.

The Commission in its brief argues that the inquiry required by Bratsk is at odds with the Commission's obligations under the antidumping laws, but we regard the inquiry into "but for" causation as a proper part of the Commission's responsibility to determine whether the injury to the domestic industry is "by reason of" the subject

imports. Moreover, that inquiry is consistent with the characterization of the Commission's obligations in the Statement of Administrative Action ("SAA") that accompanied the 1994 Uruguay Round Agreements Act. The SAA states that the Commission must examine all relevant evidence, including any known factors, other than the dumped or subsidized imports, that may be injuring the domestic industry, and that the Commission must examine those other factors "to ensure that it is not attributing injury from other sources to the subject imports." The Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Doc. No. 103-316 (Vol. I), at 851-52 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4184-85; see also S. Rep. No. 96-249, at 75 (1979), as reprinted in 1979 U.S.C.C.A.N. 381, 461 ("in examining the overall injury to a domestic industry, the ITC will consider information which indicates that harm is caused by factors other than less-than-fair value imports").

C

In its remand determination, the Commission stated that it interpreted our decision in Bratsk to require the Commission, when applying the "replacement/benefit" test, to apply "a presumption in favor of finding replacement" whenever the "triggering factors" are present, i.e., whenever the antidumping investigation is directed to a commodity product and price competitive non-subject imports are a significant factor in the market. The Commission explained that because, as a practical matter, the Commission and domestic producers "will seldom have information to rebut" that presumption, the effect of the replacement/benefit test "seems to require the agency to render a negative determination, if the triggering factors are satisfied, unless the record contains substantial evidence that either non-subject imports would not replace the

subject imports or that such replacement would nonetheless benefit the domestic industry."

Applying that approach in light of the record in this case, the Commission first found that evidence supported the conclusion that non-subject countries and non-CBERA subject countries had sufficient capacity during the period of investigation to fully replace the subject imports from Trinidad and Tobago. The Commission then concluded that although there was no evidence before it as to whether non-Trinidadian imports actually would have replaced the subject Trinidadian imports, it had to find that there would have been replacement (and no benefit to the domestic industry) based on the "presumption in favor of replacement" purportedly required by Bratsk. For that reason, the Commission felt that it was required to find that the injury to the domestic industry was not "by reason of" subject imports.

Contrary to the Commission's interpretation, we do not regard the decision in Bratsk as requiring the Commission to presume that producers of non-subject goods would have replaced the subject goods if the subject goods had been removed from the market. Although we stated there, and reaffirm here, that the Commission has the responsibility to consider the causal relation between the subject imports and the injury to the domestic industry, that responsibility does not translate into a presumption of replacement without benefit to the domestic industry.

In the portion of the Bratsk opinion that the Commission regards as having created a presumption of replacement, the court was addressing one of the arguments made by the Commission, namely, that the subject importer had "not demonstrated" that "non-subject imports were well positioned to completely fill any void left by the

withdrawal of subject imports from the market." 444 F.3d at 1376 (quoting the Commission's brief). The court responded to that argument by pointing out that it was the Commission's responsibility to make a finding on the issue of causation, and that it was not the subject importer's burden to demonstrate that the subject imports did not cause the injury to the domestic industry. Id. The court's point was that the Commission could not acquit its responsibility to address the issue of causation simply by pointing to the subject importer's failure to offer evidence to negate causation. See S. Rep. No. 96-249, at 75 (1979), as reprinted in 1979 U.S.C.C.A.N. 381, 461 (Commission must consider information indicating that harm is caused by factors other than LTFV imports, but "the petitioner will not be required to bear the burden of proving the negative.").

To say that an affirmative determination must be based on evidence that the injury to the domestic industry is "by reason of" subject imports does not require the Commission to address the causation issue in any particular way, or to apply a presumption that non-subject producers would have replaced the subject imports if the subject imports had been removed from the market.[1] The Commission is simply

---

[1] Mittal acknowledges in its brief that the court in Bratsk "did not create a rebuttable presumption that if replacement could occur it would occur. Rather, it merely enforced the Commission's obligation to satisfy the 'by reason of' causation standard with a reasoned explanation, supported by substantial evidence." Nonetheless, Mittal contends that the record contains sufficient evidence to affirm the Commission's conclusion that other imports would not have replaced the subject imports from Trinidad and Tobago during the period of investigation. Whether or not that is the case, the Commission did not base its determination on a finding with respect to the strength of the evidence that other imports would not have replaced subject imports, and we therefore cannot affirm the agency's decision on that ground. See Sec. & Exch. Comm'n v. Chenery, 332 U.S. 194, 196 (1947).

required to give full consideration to the causation issue and to provide a meaningful explanation of its conclusions. See Bratsk, 444 F.3d at 1376 ("While there may be support for the Commission's ultimate determination of material injury in the record here, we find that the Commission did not sufficiently explain its decision in this regard.").

What Bratsk held is that "where commodity products are at issue and fairly traded, price competitive, non-subject imports are in the market," the Commission would not fulfill its obligation to consider an important aspect of the problem if it failed to consider whether non-subject or non-LTFV imports would have replaced LTFV subject imports during the period of investigation without a continuing benefit to the domestic industry. 444 F.3d at 1369. Under those circumstances, Bratsk requires the Commission to consider whether replacement of the LTFV subject imports might have occurred during the period of investigation, and it requires the Commission to provide an explanation of its conclusion with respect to that factor. The Commission must further explain whether the record provides support for a finding that the domestic industry was materially injured "by reason of" the LTFV subject imports after it has considered the analysis described in Gerald Metals and Bratsk along with the statutorily mandated factors and any other relevant economic factors that the Commission elects to consider under section 1677(7)(B)(ii). 444 F.3d at 1373 & n.3. Bratsk did not read into the antidumping statute a Procrustean formula for determining whether a domestic injury was "by reason of" subject imports. It simply required the Commission to consider the "but for" causation analysis in fulfilling its statutory duty to determine whether the subject imports were a substantial factor in the injury to the domestic industry, as

opposed to a merely "incidental, tangential, or trivial" factor. <u>Nippon Steel Group v. Int'l Trade Comm'n</u>, 345 F.3d 1379, 1381 (Fed. Cir. 2003).[2]

We therefore vacate the judgment of the Court of International Trade and remand with directions for that court to remand the case to the Commission for further consideration of the material injury issue in light of this opinion.

D

In its decision, the Commission noted that our opinion in <u>Bratsk</u> did not mention whether replacement of LTFV subject imports by nondumped imports is a factor that should be considered in threat determinations. Nonetheless, the Commission declined to issue an affirmative determination as to the threat of material injury to the domestic industry based on the presumption that nondumped imports would have replaced the LTFV subject imports from Trinidad and Tobago. Because that analysis was not required by our decision in <u>Bratsk</u> and our prior decision in this case for the reasons discussed, we vacate the judgment of the Court of International Trade and remand for further proceedings with respect to the threat of material injury as well.

In concluding that the Commission committed legal error in the remand proceedings in this case, we intend no criticism of the Commission's effort to comply

---

[2]  Commissioners Pearson and Okun have noted that interpreting <u>Bratsk</u> in that manner, i.e., as "a reminder that the Commission, before it makes an affirmative determination, must satisfy itself that it has not attributed material injury to factors other than subject imports," is consistent with the Commission's obligation to "analyze the effects of the unfairly traded imports and other relevant factors in a way that enables the Commission to conclude that it has not attributed the effects of other factors to the subject imports." Separate and Additional Views of Chairman Daniel R. Pearson and Commissioner Deanna Tanner Okun Concerning <u>Bratsk Aluminum v. United States</u>, in <u>Sodium Hexametaphosphate from China</u>, Inv. No. 731-TA-1110 (Preliminary), USITC Pub. 3912 (Apr. 2007), at 21.

with this court's previous directions.  Indeed, the error we have found flows largely from the Commission's effort to proceed with scrupulous attention to the terms of this court's remand instructions.  The problem may stem from a lack of sufficient clarity in our prior opinion, which we hope has been rectified in this one.

Each party shall bear its own costs for this appeal.

<u>VACATED and REMANDED</u>.